# United States Court of Appeals

### For the Eighth Circuit

_____

No. 23-1410

_____

Ricky Hughes

*Plaintiff - Appellant*

v.

Canadian National Railway Company

*Defendant*

Wisconsin Central, Ltd.; Portaco, Inc.; Racine Railroad Products, Inc.

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: December 15, 2023
Filed: June 25, 2024
_____

Before ERICKSON, MELLOY, and STRAS, Circuit Judges.
_____

MELLOY, Circuit Judge.

Railroad employee Plaintiff Ricky Hughes was injured at work twice in separate incidents during the pendency of his Chapter 13 bankruptcy. Approximately 19 months after his bankruptcy closed, Mr. Hughes filed the present

personal injury lawsuit.  Because Mr. Hughes had not disclosed the potential lawsuit in his bankruptcy, the district court granted summary judgment against Mr. Hughes based on standing and judicial estoppel.  We conclude Mr. Hughes has standing.  We also conclude judicial estoppel applies to claims arising from the first incident but not the second.  Accordingly, we affirm in part and reverse in part.

I.

Mr. Hughes filed a Chapter 13 bankruptcy petition in May 2012.  He commenced payments under an unconfirmed five-year Chapter 13 plan soon after filing his bankruptcy petition.  Later, in December 2012, the bankruptcy court confirmed his plan. Mr. Hughes made his last required payment in spring 2017, and the bankruptcy court entered an order in April 2017 recognizing the completion of payments.  In February 2018, the bankruptcy court issued an order discharging approximately $57,000 of unpaid, unsecured debt.  Mr. Hughes made approximately $26,000 in payments as required by the plan.  In March 2018, the bankruptcy closed.

Meanwhile, in October 2016, while still making plan payments, Mr. Hughes was injured in an accident at work.  Then, in August 2017, several months after he completed his five-year payment plan but before he received his discharge order and before his bankruptcy closed, Mr. Hughes was injured in another accident at work.  Although he had an ongoing duty to inform the bankruptcy court of pending or potential causes of action, he did not inform the bankruptcy court of potential lawsuits related to the injuries.  Various bankruptcy forms, acknowledgments, and orders had expressly informed Mr. Hughes of his disclosure duty.

After each accident, Mr. Hughes was temporarily unable to work.  Within two weeks of each accident, he submitted a form to the Railroad Retirement Board, 45 U.S.C. §231f, applying for sickness benefits.  On both forms, he checked a box stating "yes" in response to the compound question: "Have you filed or do you expect to file a lawsuit or claim against any person or company for personal injury?"

-2-

Below the checked box, he indicated the person or company as his employer, "Canadian National Railroad, Co."[1]

In October 2019, over two years after his last plan payment and approximately 19 months after his bankruptcy closed, Mr. Hughes filed the present personal injury lawsuit against Wisconsin Central alleging negligence claims pursuant to the Federal Employers' Liability Act, 45 U.S.C § 56–58. Mr. Hughes later filed amended complaints adding Portaco, Inc., and Racine Railroad Products, Inc., as defendants and alleging strict liability and negligence claims pursuant to state law based on product liability. Claims against Portaco and Racine Railroad Products alleged liability related to the second accident; there is no allegation either defendant was involved in the first accident.

Defendants moved for summary judgment alleging Mr. Hughes lacked standing because any cause of action arising during the bankruptcy belonged to the Trustee to be prosecuted for the benefit of the bankruptcy estate. In the alternative, Defendants argued Mr. Hughes should be judicially estopped from pursuing his lawsuit because he failed to disclose the lawsuit and gained an advantage through the bankruptcy discharge. None of the Defendants assert that they were creditors in the bankruptcy. As such, their identification of an "advantage" focused on Mr. Hughes's position relative to his creditors rather than his position relative to Defendants. Mr. Hughes resisted and asserted standing. He also argued judicial estoppel should not apply because he gained no unfair advantage, asserted no clearly inconsistent positions, and induced no reliance by the bankruptcy court. Mr. Hughes argued he failed to disclose the potential lawsuit because he did not realize during the bankruptcy the extent to which his injuries would affect his long-term ability to work.

---

[1]Mr. Hughes's employer, Defendant Wisconsin Central, Ltd., is a wholly owned subsidiary of Defendant Canadian National Railway Company through several layers of wholly owned subsidiaries. The district court dismissed the case without prejudice as to Canadian National Railway Company, and we refer to the employer as Wisconsin Central.

Before the district court ruled on the summary judgment motion, Mr. Hughes applied to the bankruptcy court to reopen his bankruptcy and list the claims as assets of the estate. Mr. Hughes also asked the bankruptcy court to approve an agreement he had entered into with the Trustee to collect funds received in the present suit and distribute them for the benefit of creditors to the extent of discharged debt. The bankruptcy court reopened the bankruptcy. Portaco objected and filed briefs.

The district court then denied the pending motion for summary judgment without prejudice and stayed the present case to allow Mr. Hughes to obtain rulings from the bankruptcy court. In its order, the district court stated, "the record does not suggest that [Mr. Hughes] acted with any intent to defraud creditors or to intentionally mislead or manipulate the judicial system." The district court concluded, however, that "it is not clear . . . the interests of creditors are not still implicated in the reopened proceeding."

Next, the bankruptcy court denied Mr. Hughes's requested relief. As a preliminary matter, the bankruptcy court held Portaco lacked standing to object. On the merits, the bankruptcy court held that the statutory section governing plan modification permits Chapter 13 plan modifications only if a debtor's final payment to creditors will occur within five years of the debtor's first payment. *See* 11 U.S.C. § 1329(c) ("A plan modified under this section may not provide for payments over a period that expires after the applicable commitment period under section 1325(b)(1)(B) after the time that the first payment under the original confirmed plan was due, unless the court, for cause, approves a longer period, but the court may not approve a period that expires after five years after such time."). The bankruptcy court noted that roughly ten years had passed since Hughes's first Chapter 13 payment and several years had passed since the bankruptcy had closed. After describing these time frames, the bankruptcy court explained that substantially shorter time frames likely would not have changed the outcome:

> Ironically, there has been no harm to creditors as a result of the Debtor's failure to disclose the Lawsuit. This is because the potential recovery

to the Debtors from the Lawsuit could not have been paid within the five years since even now, years later, no money has been awarded or paid to the Debtors. In fact, the injury which Mr. Hughes alleges Portaco caused did not occur until August 8, 2017, after the five-year period expired. In other words, even if disclosed in a timely manner, the creditors would have received nothing under the confirmed Chapter 13 plan from the Lawsuit, as there was nothing to distribute during the five-year period.

Finally, the bankruptcy court noted that even though no plan modification or settlement approval was allowed, debtors may always voluntarily make post-discharge payments to creditors on their own or with the aid of any intermediary, including a trustee acting in an unofficial capacity. *See* 11 U.S.C. § 524(f) ("Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt.").

Subsequently, the district court granted summary judgment. The district court held that Mr. Hughes lacked standing and, alternatively, judicial estoppel applied. Regarding judicial estoppel, the court again noted there was "no clear record of malice on Plaintiff's part." The district court concluded, however, that "malice was not required, and a motive to conceal could be inferred where the Trustee was not privy to the asset at the time debts were discharged." Mr. Hughes appeals.

II.

A.

We review the question of standing de novo. *See Am. Ass'n. of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1101 (8th Cir. 2006). Here, the question of standing is a question of statutory interpretation concerning who "owns," or has the legal right to assert, the civil claims at issue. Some of the statutory provisions material to our standing analysis apply generally to several chapters of the Bankruptcy Code. Others are specific to Chapter 13. Here, the interplay of these provisions matters. As such, a few general comments about different chapters of the

Code provide context for understanding the present arguments. *See, e.g.*, *Harris v. Viegelahn*, 575 U.S. 510, 512–15 (2015) (comparing and contrasting Chapters 7 and 13 and stating, "Chapter 7 allows a debtor to make a clean break from his financial past, but at a steep price: prompt liquidation of the debtor's assets. . . . Chapter 13 works differently").

Perhaps the most well-known form of bankruptcy is a Chapter 7 "liquidation" bankruptcy for an individual. Barring complex underlying legal or factual questions, Chapter 7 bankruptcies may be administered relatively quickly. Assets are marshalled as an estate, creditors' security interests generally are honored, and non-exempt assets (if any) are distributed to cover some portion of unsecured allowed claims from creditors. With a few exceptions, the estate includes all of the debtor's equitable and legal interests in assets, including contingent interests such as legal claims, as of the time the bankruptcy petition is filed. *See* 11 U.S.C. § 541. "Crucially, however, a Chapter 7 estate does not include the wages a debtor earns or the assets he acquires *after* the bankruptcy filing." *Harris*, 575 U.S. at 513–14. "Thus, while a Chapter 7 debtor must forfeit virtually all his prepetition property, he is able to make a 'fresh start' by shielding from creditors his postpetition earnings and acquisitions." *Id.* at 514. Chapter 7, therefore, reflects a Congressional determination that debtors may receive a fresh start in the form of a "discharge" of most debts in exchange for disgorging assets that exist at a particular point in time. At the end of a Chapter 7 bankruptcy, estate assets that have not been scheduled and that the trustee has not distributed to creditors, expressly abandoned, or otherwise "administered" remain assets of the estate. *See* 11 U.S.C. § 554(c)–(d).

A Chapter 13 bankruptcy, in contrast, allows a debtor to keep assets and obtain an eventual fresh start in exchange for the completion of three to five years of payments to creditors, usually from postpetition income, pursuant to a court-approved plan. As with Chapter 7, assets are marshalled as an "estate." But, the definition of the estate is expanded to include everything that is included in a Chapter 7 estate as well as wages and assets the debtor receives postpetition while the Chapter 13 proceedings are ongoing. 11 U.S.C. § 1306(a). The estate, however, is

not distributed to creditors. *See* 11 U.S.C. § 1306(b) ("Except as provided in a confirmed plan or order confirming a plan, the debtor shall remain in possession of all property of the estate."). Rather, the court and creditors may examine the Chapter 13 estate, consider the debtor's expected income, and voice their support or objections as to whether a proposed payment plan should be "confirmed." A court may confirm a debtor's proposed Chapter 13 plan if creditors holding allowed claims will receive value equal to, or in excess of, what they would receive from an immediate liquidation. *See* 11 U.S.C. § 1325(a)(4). As such, "[p]roceedings under Chapter 13 can benefit debtors and creditors alike. Debtors are allowed to retain their assets, . . . [and] creditors . . . usually collect more under a Chapter 13 plan than they would have received under a Chapter 7 liquidation." *Harris*, 575 U.S. at 514. A debtor may voluntarily convert their Chapter 13 bankruptcy to a Chapter 7 bankruptcy "at any time." *See* 11 U.S.C. § 1307(a). This right of conversion is unqualified and requires only notice rather than a court's permission. *See* Fed. Rule Bankr. P. 1017(f)(3). In some instances, when specified conditions are met, creditors may force such a "conversion." *See* 11 U.S.C. § 1307(c)(1)–(11).

Once the court confirms a Chapter 13 plan, however, the estate "vests" in the debtor. *See* 11 U.S.C. § 1327 ("(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor. (c) Except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor provided for by the plan."). This Congressional choice makes sense in light of the nature of the exchange in Chapter 13 (*i.e.*, payments for discharge) and also because the debtor may need the assets to successfully maintain the income required to satisfy payment plan obligations (*e.g.*, a car for reaching a job). But, throughout the plan period, the debtor has an ongoing obligation to disclose new assets to the court. *See* 11 U.S.C. § 1306(a)(1)–(2) (estate definition). Any new assets serve to inform the parties and the court whether plan modification or conversion to Chapter 7 may be appropriate.

In broad strokes then, barring conversion, the function of the Chapter 13 estate might be considered informational whereas the Chapter 7 estate is for distribution. In addition, the typically longer time frames at issue in Chapter 13 present greater potential for changed circumstances to arise mid-bankruptcy. For example, after plan confirmation, a debtor's fortunes may change through an improved or diminished salary, a surprise inheritance, or an unexpected disability. The debtor or creditors may move for plan amendment to alter payments or extend the payment period. *See* 11 U.S.C. § 1329(a) ("At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim[.]"). If the initially confirmed plan provided a period of payments less than five years, a modified plan may extend the payment period, but not beyond five years as measured from the first payment. *Id.* § 1329(c). As these provisions illustrate, Congress anticipated the potential for changed circumstances throughout pending Chapter 13 bankruptcies and established time limits for certain procedures within Chapter 13. Congress thus balanced the need to accommodate changes during the plan period against the need to permit the debtor a meaningful opportunity at a fresh start.

Against this backdrop, the question of standing asks: who holds the right to assert the present claims against Wisconsin Central, Portaco, and Racine Railroad Products. The answer to this question depends on the fate of *undisclosed* assets a Chapter 13 debtor receives during the pendency of the bankruptcy. As already noted, Section 554(d), which applies generally to different chapters of the Code, provides that undisclosed estate assets that have not been expressly abandoned remain property of the estate. But Section 1327, which applies specifically to Chapter 13, provides that estate assets vest with the debtor. Defendants argue Section 554(d) controls. Mr. Hughes argues the more specific provision of Section 1327 controls.

Mr. Hughes has the better argument. A basic canon of statutory construction supports Mr. Hughes's position that Section 1327 controls over Section 554(d): a specific provision applying with particularity to a matter should govern over a more

general provision encompassing that same matter. *See Nitro-Lift Technologies, L.L.C. v. Howard*, 568 U.S. 17, 21 (2012) ("[T]he ancient interpretive principle that the specific governs the general (*generalia specialibus non derogant*) applies only to conflict between laws of equivalent dignity."); *Bloate v. United States*, 559 U.S. 196, 207–08 (2010) ("There is no question that . . . [g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment[.]" (citation omitted)); s*ee also, In re Thompson*, 344 B.R. 461, 464 (Bankr. W.D. Va. 2004) ("While section 554 is generally applicable to proceedings under Chapters 7, 11, 12 and 13 of the Bankruptcy Code, 11 U.S.C. § 103(a), it is subject to the specific provision of 11 U.S.C. § 1327(b)[.]"). The Bankruptcy Code is a comprehensive body of law where generally applicable provisions are supplemented or superseded throughout by more specific provisions to control in specific situations. We conclude this canon of construction carries particular weight when construing such a body of authority.

Further, there simply is no textual support for distinguishing between disclosed and undisclosed assets when applying Section 1327. *See, e.g.*, *In re Frausto*, 259 B.R. 201, 217 (Bankr. N.D. Ala. 2000) ("No provision of the Bankruptcy Code provides for the negation of the effect of section 1327 as to property owned by a debtor but not disclosed."). Defendants' argument that the lack of disclosure creates an exception that would allow a court to ignore Section 1327 and apply Section 554(d), therefore, is akin to a "legislative purpose" argument: if a debtor fails to disclose an interest such as a potential lawsuit, the creditors and the bankruptcy court are deprived of the informational value and the corresponding opportunity to assess whether plan modification or conversion might be appropriate. And to the extent Defendants' argument is a more general appeal to equity rather than an assertion of presumed legislative intent, we note that bankruptcy proceedings generally are equitable in nature. But we may not ignore plain statutory text based on considerations of equity. *See In re Hen House Interstate, Inc.*, 177 F.3d 719, 723 (8th Cir. 1999) ("Policy considerations and equitable concerns, however, are impermissible bases for statutory interpretation when, as here, the language of the

statute is clear and unambiguous.").  Here, the present claims vested with Mr. Hughes.  He has standing.

B.

Judicial estoppel, in contrast to standing, is an equitable doctrine.  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  We review the application of judicial estoppel for abuse of discretion, affirming "unless it plainly appears that the court committed a clear error of judgment in the conclusion it reached upon a weighing of the proper factors." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006) (citation omitted) (reviewing for abuse of discretion even where the district court applied judicial estoppel in the context of summary judgment).

Courts may apply the doctrine to protect the integrity of judicial proceedings. *Id.*  "[J]udicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *New Hampshire*, 532 U.S. at 749 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227, n.8 (2000)).  The doctrine may also apply in separate suits, regardless of whether all the parties in the two suits are the same.  *See Stallings*, 447 F.3d at 1047 ("Judicial estoppel prevents a person who states facts under oath during the course of a trial from denying those facts in a second suit, even though the parties in the second suit may not be the same as those in the first." (quoting *Monterey Dev. Corp. v. Lawyer's Title Ins. Corp.,* 4 F.3d 605, 609 (8th Cir. 1993))).  But application of the doctrine generally will be more clear—equity may more clearly demand its application—where the attempted assertion of a "contrary position" "prejudices the party 'who acquiesced in the position formerly taken.'"  *Id.* (quoting *New Hampshire*, 532 U.S. at 749)).

Application of the doctrine should not be automatic.  The Court has noted the flexible nature of the doctrine, stating that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general

formulation of principle." *New Hampshire*, 532 U.S. at 750 (citations omitted). Nevertheless, three broad factors drive our analysis:

> First, a party's later position must be *clearly inconsistent* with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Stallings*, 447 F.3d at 1047 (emphasis added) (quoting *New Hampshire*, 532 U.S. at 750–51).

Applying these factors to the undisclosed claims or lawsuits arising from Mr. Hughes's first accident, we find no abuse of discretion by the district court. The district court found the failure to disclose the potential claim against Wisconsin Central in bankruptcy tantamount to a denial of the claim's existence. In particular, the district court found the failure to disclose served as a knowing, rather than inadvertent, nondisclosure in that the Railroad Retirement Board application for sickness benefits demonstrated knowledge of the claim's existence. *See Van Horn v. Martin*, 812 F.3d 1180, 1183 (8th Cir. 2016) (applying judicial estoppel in the bankruptcy context where it was undisputed that a debtor's failure to amend asset schedules was knowing rather than inadvertent). The district court also found the later assertion of the claim in district court to be clearly inconsistent with the earlier, knowing nondisclosure. We find no abuse of discretion.

As to the second and third factors, six months of plan payments remained when Mr. Hughes suffered his first injury. The district court reasonably deemed information concerning the possibility of recovery material to the bankruptcy court

-11-

and the debtors. *See* 11 U.S.C. § 1329(a) ("At any time after confirmation of the plan but before the completion of payments . . . the plan may be modified, upon request of the . . . holder of an allowed unsecured claim."). The district court also found the eventual discharge order and conclusion of the Chapter 13 bankruptcy demonstrated judicial reliance on Mr. Hughes's nondisclosure. Given that plan modification remained possible when Mr. Hughes was injured, we find no abuse of discretion. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3rd Cir. 1996) ("[D]isclosure requirements are crucial to the effective functioning of the federal bankruptcy system. Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.").

Turning to the second injury, however, we believe the passage of time mandates a different outcome. When Mr. Hughes was injured for the second time, he had already made all of the payments required under his five-year plan. More than five years had passed since he made his first payment. There existed no permissible statutory basis to modify the plan in August 2017 when he was injured—no statutory basis for providing additional payments to creditors. *See* 11 U.S.C. § 1322(d)(1) (stating as a requirement for any plan that "the plan may not provide for payments over a period that is longer than 5 years"); 11 U.S.C. § 1329(c) (stating as a requirement for plan modification that the plan period may be extended but that "the court may not approve a period that expires after five years after" "the first payment under the original confirmed plan was due"); *see also, e.g.*, *Profit v. Savage* (*In re Profit)*, 283 B.R. 567, 575 (B.A.P. 9th Cir. 2002) (noting that the five year period is measured from the first payment under the unconfirmed plan and stating "The request for modification must be made 'any time after confirmation of the plan but before the completion of payments under such plan.'" (quoting 11 U.S.C. § 1329(a))).

In practical effect, the absence of a discharge order in Mr. Hughes's bankruptcy prior to August 2017 appears to have been mere happenstance. The

Code mandates that a discharge order be issued as "as soon as practicable after completion by the debtor of all payments under the plan" subject to several exceptions not alleged to be applicable here. 11 U.S.C. § 1328(a). The bankruptcy court had entered an order in Spring 2017 recognizing the completion of required payments. Given these time frames, there appears to have been nothing of substance left for the bankruptcy court to do. Importantly, Defendants identify no source of authority for denying discharge after Mr. Hughes's completion of payments. As such, the bankruptcy court in no manner "relied" on the second nondisclosure. There was no risk or appearance of the bankruptcy court having been "misled" and "no risk of inconsistent court determinations" or "threat[s] to judicial integrity." *Stallings*, 447 F.3d at 1047.

Moreover, even if the question of adverse reliance by the bankruptcy court were a close call, Defendants were not prejudiced. While it is not necessary that a party to the later action be personally prejudiced by the prior inconsistent position, such prejudice (as contrasted with mere advantage to the plaintiff or prejudice to a party in the prior proceeding) makes the need for judicial estoppel stronger. *See, e.g.*, *Stallings*, 447 F.3d at 1047 ("especially if doing so prejudices the party 'who acquiesced in the position formerly taken'"(quoting *New Hampshire*, 532 U.S. at 749)). In these circumstances, with no prejudice to the parties asserting judicial estoppel and no other showing of harm or unfairness, applying the doctrine was an abuse of discretion. *See, e.g.*, *Ryan Operations G.P.*, 81 F.3d at 365 ("[Judicial estoppel] is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims.")

We affirm in part, reverse in part, and remand for proceeding consistent with this opinion.

_____